FILED
2011 Mar-23  PM 03:22
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **VERLINDA LEWIS,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 2:09-CV-98-RDP** |
| | } | |
| **POSTMASTER GENERAL, JOHN E. POTTER,** | } | |
| | } | |
| **Defendant.** | } | |

**<u>MEMORANDUM OPINION</u>**

This is an employment discrimination case brought under Titles I and II of the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act of 1973, Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, and 42 U.S.C. §§ 1981 and 1983. (Doc. # 11).[1]  Plaintiff, Verlinda Lewis, claims that she was discriminated against in the terms and conditions of her employment with the United States Postal Service ("USPS") because of her race and disability, and also retaliated against.  Specifically, Plaintiff's Amended Complaint asserts the following claims:

1.      Count I: Plaintiff claims that her days off were changed from every Sunday and every other Saturday to every Wednesday and Saturday because of her disability and that Defendant failed to reasonably accommodate her disability in violation of the ADA and the Rehabilitation Act;

---

[1] Although plaintiff has purported to sue under the ADA, the federal government is not subject to the ADA and therefore, disability discrimination claims against the USPS must be brought under the Rehabilitation Act of 1973, 29 U.S.C. §§ 701-796. *See Henrickson v. Potter*, 327 F.3d 444, 447 (5th Cir. 2003) (no claim is permitted under ADA against the USPS). "The Rehabilitation Act, not the Americans with Disabilities Act (ADA), constitutes the exclusive remedy for a federal employee alleging disability-based discrimination." *Jones v. Potter*, 488 F.3d 397, 403 (6th Cir. 2007) (citing 42 U.S.C. § 12111(5)(B)(I)).

2.      Count II: Plaintiff claims that her days off were changed from every Sunday and every

other Saturday to every Wednesday and Saturday because of her race in violation of Title VII;

3.      Count III: Plaintiff claims that Defendant retaliated against her for opposing race

discrimination in violation of Title VII ; and

4.      Count IV: Plaintiff claims that Defendant retaliated against her for seeking reasonable

accommodation under the ADA and the Rehabilitation Act.  (*See, generally*, Doc. # 11).

## I.      Facts[2]

In June 1992, Plaintiff became employed with the USPS as a rural letter carrier. (Doc. # 22-1

p. 26).  In January 1998, Plaintiff was assigned to the Meadowbrook Station (Meadowbrook) as a

rural letter carrier. (Doc. # 22-1 p. 26). Meadowbrook is a branch of the Birmingham Post Office,

which is composed of stations and branches within the City of Birmingham. (Doc. # 22-6 pp. 60,

61).  As a rural letter carrier, Plaintiff's off days were every other Saturday and each Sunday. (Doc.

# 22-2 pp. 35-36).

In 2003, while delivering mail, Plaintiff had a coughing attack causing her to pass out and

run her vehicle into a mailbox. (Doc. # 22-1 pp. 27-28).   As a result of the accident, Plaintiff was

no longer able to perform the duties of a rural letter carrier. (Doc. # 22-1 p. 28).   Plaintiff filed an

occupational disease claim which was ultimately accepted by the Office of Workers Compensation

(OWCP). (Doc. # 22-6 p. 66).  On June 30, 2002, Plaintiff's physician provided a form to the USPS

detailing Plaintiff's medical restrictions. (Doc. # 22-3).

---

[2]  If facts are in dispute, they are stated in the manner most favorable to the non-movant.
*Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

## A.  Limited Duty Position and EEO Complaint No. 4H-350-0032-07

As a result of her restrictions, Plaintiff was given a modified assignment - limited duty (hereinafter "limited duty") position performing clerical duties at Meadowbrook consistent with her medical and physical restrictions. (Docs. # 22-4 and 22-5). Limited duty is a term used for a job assignment given to an injured employee who has temporary medical and physical restrictions due to an OWCP accepted condition. If the restriction becomes permanent, the employee is placed in a permanent rehabilitation assignment. (Doc. # 22-6 p. 57; Doc. # 22-7 p. 34). The limited duty assignment is a temporary, not permanent, assignment (Doc. # 22-2 p. 23), and is simply the designation of duties to be performed on a temporary basis by an injured employee, rather than a position (Doc. # 22-6 p.68).

The USPS policy provision EL 505 establishes guidelines for limited duty assignments. (Doc. # 22-8). EL - 505 states that the USPS should minimize any adverse or disruptive impact on an employee in assigning limited duty. The guideline lists several considerations in assigning limited duty, e.g. matching the limited duty job as closely as possible to the regular job. The limited duty job should not be more desirable than the employee's regular job. The limited duty job should be a function of where temporary additional help is useful. (Doc. # 22-8). EL-505 also gives guidance for priority of job assignment: "Whenever possible, assign qualified employees to limited duty in their regular craft, during regular tour of duty, and in their regular work facility." (Doc. # 22-8).

The medical restrictions of the injured employee form the basis for creating the temporary limited duty position. (Doc. # 22-6 pp. 10, 59; Doc. # 22-2 p.19). When an injured employee has a medical restriction, the HRM notifies the employee's manager of the restrictions. The manager submits a list of duties he believes the employee can perform within her medical restrictions and

which support the USPS's core business objectives. (Doc. # 22-6 p. 59).

Initially, while on limited duty, Plaintiff maintained her permanent bid position as a rural letter carrier, although she was not performing the duties of that position.  The USPS is required to hold a rural carrier's bid position for a period of two years after an injury with no change in tour of duty, facility assignment, or off days.  The expectation is that, within that time frame, the temporary restrictions will be lifted and that the employee will be able to resume her original bid position. (Doc. # 22-2 pp. 12-13).  If, after two years, the employee has not been able to resume the duties of her regular bid position, she must relinquish that route or position.  (Doc. # 22- 2, p. 13).  Under those circumstances, once the employee reaches maximum medical improvement, the USPS will then place the employee in a full-time  permanent modified job within her medical and physical limitations. (Doc. # 22-6 p. 10).

While on limited duty starting in 2004, Plaintiff's duties included: casing and boxing mail, knockouts (undeliverable mail), filing change of addresses, handling ACS, CFS mail, and writing second notices and certifies.  (Doc. # 22-1 p. 27; Doc. # 22-5).  Later in the year, Plaintiff learned to process edit sheets, worked in the box section, changed locks on the post office boxes, and, if the counter became busy, she helped postal customers. (Doc. # 22-1 p. 29).   Although she was performing clerk duties, during this time Plaintiff still maintained her permanent bid position and remained classified as a rural mail carrier.  She received her mail carrier pay and had her mail carrier off-days of Saturday and Sunday. (Doc. # 22-2 pp. 35-37). The Manager of the Meadowbrook Station, Morgan Taylor, was obligated, pursuant to Union contract, to continue Plaintiff's rural mail carrier status, including her rural mail carrier off-days (Saturday and Sunday) for a period of two years. (Doc. # 22- 2 pp. 34, 35).

**B.     After Two Years, Plaintiff Receives a Permanent Modified Position**

After approximately two years, Plaintiff remained unable to return to her duties as a rural mail carrier and therefore "lost her bid" to that position. (Doc. # 22- 2 p. 33). After that time period passed, the USPS was no longer obligated to create a limited duty position for her, and it instead was required to look to available positions for a permanent assignment she could perform within her work restrictions. (Doc. # 22-6 p. 10). The USPS will try to keep an employee such as Plaintiff in the same craft as her bid position, within her same tour, and within the same facility. However, that is not guaranteed and if that is not possible, it will look to move the employee to a different craft. (Doc. # 22-6 p.13). If the medical restrictions require a change of craft to find an employee a permanent modified position, pursuant to the appropriate collective bargaining agreement, an employee loses seniority in the prior craft and is assigned a new seniority date in the new craft. (Doc. # 22-6 p. 25).

Once the treating physician notifies the USPS that an employee has a permanent restriction, the Office of Health and Resource Management ("HRM") sends that information to the injured employee's manager informing the manager that the injured employee has a permanent restriction and needs a permanent assignment. In such cases, because the position will be permanent in nature, the business needs of the USPS are considered. (Doc. # 22-6  p.18).

The employee's manager will provide HRM with a list of duties that are available and that the employee can perform within his or her work restrictions. (Doc. # 22-6 p. 18). After receiving that list, HRM will draft the job offer with the appropriate salary level and title and send it to the employee. (Doc. # 22-6 p. 18). In this case, Taylor was notified by HRM that he needed to create a permanent position for Plaintiff as a clerk since she was being converted from the rural carrier craft

to the clerk craft. (Doc. # 22- 7 p. 69; Doc. # 22- 6 p. 18).   When an employee is moved to a new craft, there is frequently a change of days off because the work schedule and organizational needs are different.  (Doc. # 22-6 p. 15; Doc. # 22- 2 p. 29).

On December 29, 2006, when she no longer could perform her job as a rural mail carrier and had exhausted her two year period on limited duty, Plaintiff was offered a position as a Modified Full Time Sales and Service Distribution Associate with a salary of $51,974 and off days of Sunday and Wednesday.  (Doc. # 22-9).   This position is in the clerk craft.  (Doc. # 22-10).

Plaintiff's duties included, among others, retail window relief and assisting customers with hold mail, accountables and parcels, breaking down mail for distribution, working mail in box section, performing address management work, handling 2nd notices, computer forwarding service mail, handling return to sender mail and change of addresses, answering the telephone and assisting customers by taking messages for her supervisor. (Doc. # 22-7 p.68).  In response to this job offer, Plaintiff informed Taylor that she was unable to work the retail window because customers who wore perfume exacerbated her respiratory condition. (Doc. # 22-11 p. 56).

On January 24, 2007, Plaintiff's treating physician, Dr. Strickland, wrote a letter stating that Plaintiff's condition was "aggravated by chemicals used in products for cleaning, stripping and waxing floors. In addition, dust, fumes, heat exposure, humidity, smoke and gasses all exacerbate[d] her symptoms."  (Doc. # 22- 12).   Dr. Strickland opined that Plaintiff should "work in an environment where there are limitations regarding no excessive dyes, no perfume or fumes, no heat exposure, no humidity, no smoke or gas exposure." (Doc. # 22-12).  Later, on February 13, 2007, Dr. Strickland stated that Plaintiff had informed him that her new job involved direct customer contact which might expose her to perfume and heavy lifting. He opined that this exposure would

put her at risk for worsening of her pulmonary health. (Doc. # 22-13).

On February 17, 2007, Dr. Strickland reiterated in a letter that Plaintiff had a history of persistent cough, with evidence of reactive airways disease or asthma. He noted that he had previously recommended that she avoid dust, chemicals, fumes, perfumes, heat exposure, frequent temperature changes, and any other exacerbating factors. He further noted that Plaintiff's condition was also aggravated by chemicals used in products for cleaning, stripping, and waxing floors. (Doc. # 22-17, p.12). However, Plaintiff did not have any breathing issues while working at Meadowbrook. (Doc. # 28-13 p. 40).

## C.    Plaintiff's Off Days Change When Assigned To Permanent Modified Clerk Position

When Plaintiff was converted from the mail carrier craft to the clerk craft, Meadowbrook already had one window clerk, one box clerk, and one limited duty clerk whose off days were already Saturdays. Meadowbrook also had a distribution clerk and a window clerk who were off on Fridays, and two clerks who had days off on Thursday. (Doc. # 22-7 p. 69; Doc. # 22-2 p. 47). The only day that Meadowbrook had only one clerk off was Wednesday. Therefore, Plaintiff's permanent clerk position offer had Sunday and Wednesday as off days. (Doc. # 22-2 pp. 42, 43, 77; Doc. # 22-11 p. 54).

Plaintiff requested that Taylor change her Wednesday off days to Saturdays so that she could take care of her mother. (Doc. # 22-7 p. 69). Plaintiff was given Saturdays off on a temporary basis for one month to make the adjustments to care for her mother. (Doc. # 22-11 p. 57). Taylor denied Plaintiff's request for a permanent change to Saturday as a day off. (Doc. # 22-11 p. 57).

When Plaintiff worked in the rural carrier craft she worked every other Saturday. (Doc. #

22-2 pp. 35, 37).[3]  Taylor kept Plaintiff's permanent modified work hours as close to her previous work hours as possible. (Doc. # 22-2 p.42).  Taylor made his decision to deny Plaintiff's request for Saturday and Sunday off days based upon the needs of the station. (Doc. # 22-2 pp. 42 - 43).  Plaintiff no longer held her bid position (mail carrier) with the guaranteed every other Saturday off day.  (Doc. # 22-2 p. 37).

Because of Plaintiff's medical restriction regarding perfume, she did not become a Full Time Sales and Service Distribution Associate because she was not able to work the retail window. (Doc. # 22-2 p. 32).  Plaintiff told Taylor that if she had to service customers who were wearing perfume, she would have to ask them to step aside so that another associate could assist them.  (Doc. # 22-2 p. 32).  Taylor believed  that it would be insulting to ask a customer to go to another clerk because his or her perfume or cologne was offensive to Plaintiff.  Furthermore, occasionally, Plaintiff would have been required to work the window alone.  (Doc. # 22-2 p. 59).

Plaintiff filed a formal complaint of discrimination on May 1, 2007, alleging that she was discriminated against based on her race and disability on January 6, 2007, when her modified job off days were changed to Sunday and Wednesday.  She named Taylor as the official responsible for changing her off days. (Doc. # 22- 7).

D.    **Alleged Comparators Regarding Off Days**

Plaintiff identified Alicia Kenerley, a white female, as a comparator who was allegedly treated more favorably.  (Doc. # 22-11 p. 35).  Kenerley was hired in the clerk craft in 1984. (Doc. # 22-11 p. 35).  In  2001, Kenerley's feet were injured on the job at Avondale. (Doc. # 22-11 p. 35).

---

[3] "She worked six days a week one week, five days a week the other. That was the position she had as a rural carrier." (Doc. # 22-2 pp. 35-36).

At that time, Kenerley's off days were Saturday and Sunday. (Doc. # 22-11 p. 42). Because of her injury, Kenerley was off work for three months and returned on limited duty status to the Avondale Station. (Doc. # 22-11 p. 40). When she initially returned to work, Kenerley was given split off days. (Doc. # 22-11 p. 42). Kenerley filed a grievance, and her Saturday and Sunday off days were restored. (Doc. # 22-11 p. 42).

In May 2002, Kenerley volunteered to go to Meadowbrook on a temporary basis, after being asked by her manager, to assist as a return mail clerk. (Doc. # 22-11 pp. 40-42). When Kenerley came to Meadowbrook from Avondale, she already had Saturday and Sunday off days. (Doc. # 22-11 p. 42). She volunteered to go to Meadowbrook only if her tour of duty did not change. (Doc. # 22-11 p. 42).

After two years of limited duty, in 2003, Kenerley was offered a permanent modified Mail Processing Clerk position (still within the clerk craft where she had a seniority date of 1984) at the Meadowbrook station with Saturday and Sunday off. (Doc. # 28-4). Kenerley was offered this position in 2003 because Meadowbrook needed a clerk to sit all day and do return to sender and address changes. Anyone chosen for that position at that time would have been given Saturday and Sunday off; those off days came with the position at that time. (Doc. # 22-7 p. 70).

Judy Delaney is a white rural carrier who was injured on April 24, 2007. (Doc. # 22-2 p. 55-57; Doc. # 22-26). She returned to work in a limited duty capacity on or about October 2008. (Doc. # 22-28). On April 27, 2010, within the two-year limited duty period, Delaney was offered a limited duty rural carrier position at Meadowbrook. (Doc. # 22-28). On May 14, 2010, a date still within her two-year limited duty period, Delaney was offered and accepted a different limited duty rural carrier position at Meadowbrook. (Doc. # 22-29). Her off days were Saturday and Sunday, as they

were before she was injured.  (Doc. # 22-28; Doc. # 22-29).  Again, Delaney was classified as a Modified Rural Carrier, but was performing limited duty work as an injured employee within the first two years of her injury.  (Doc. # 22-28; Doc. # 22-29).  Delaney performed some of the same duties Plaintiff performed while at Meadowbrook, but also delivered Express Mail and assisted customers in the lobby which, during the holiday season, could have comprised three to four hours of her day.  (Doc. # 22-2 p. 54, 57).

### E.    Plaintiff is Excessed from Meadowbrook - Complaint 4H-350-0149-08

When mail volume drops, the USPS needs fewer employees.  Beginning in March 2007, the USPS experienced a drop in revenues due to a decrease in mail volume. (Doc. # 22-2 p. 39; Doc. # 22-6 p. 59).  As a result, management decisions were made to excess certain employees based upon operational needs of the USPS.  (Doc. # 22- 2 p. 60; Doc. # 22-22;  Doc. # 22-15).  Excessing means that the employees are "being assigned to a new facility." (Doc. # 22-6 p. 25).  The Birmingham Post Office is considered one installation, but is made up of several post office locations, including Meadowbrook.  All of the locations report to the Postmaster of Birmingham. (Doc. # 22- 6, pp. 60 - 61).

Excessing is governed by the USPS's collective bargaining agreements. All employees are excessed according to seniority.  (Id. at p. 60; Doc. # 22-14). Once excessed to a new facility, the installation head must consider an employee's permanent work restrictions when determining their new permanent rehabilitation assignment at the new facility. (Doc. # 22-6 pp. 25-27; Doc. # 22-14). Employees with less seniority in their craft are disproportionately affected by excessing because "employees are excessed based on their seniority in a particular craft." (Doc. # 22-6 p. 25). Excessing and re-assignment decisions are based upon a number of factors, including operational

needs. (Doc. # 22-2 p. 62).

As a junior clerk at Meadowbrook, Plaintiff was one of the affected employees. As part of this process, Plaintiff was excessed from Meadowbrook to the Birmingham Plant. (Doc. # 22- 15). No other clerk from Meadowbrook was affected. (Doc. # 40 at ¶ 84). Several clerks, including two other permanent rehabilitation clerks identified as junior clerks, were excessed from other locations at the same time as Plaintiff. (Doc. # 22-17, bates no. 159).

### F.    Plaintiff is Offered A Position in the Birmingham Plant

Plaintiff was informed that she was being excessed from Meadowbrook by letter dated August 11, 2008.  She was offered a Modified Full Time Mail Processing Clerk position, effective August 16, 2008, at the Birmingham Plant and Distribution Center (Birmingham Plant), with a salary of $55,148.00. Her duties were to include (1) working in the box section (*i.e.,* picking up mail pieces, reading the address and placing the mail in the corresponding slot); (2) working postage due (sitting at a desk, weighing oversized mail pieces on a small electronic scale, stamping them and indicating if additional postage was needed); and (3) performing simple accounting procedures for the postage due station. (Doc. # 22-15).

Bobby Miller, the Lead Plant Manager for the Birmingham Plant, reviewed Plaintiff's permanent work restrictions and determined that she could work in the box section at the Birmingham Plant.  He based this decision on the fact that she worked in the box section at Meadowbrook. (Doc. # 22-17 p. 18).  It was believed that Plaintiff would not be exposed to dust from machines because the position at the Plant did not require Plaintiff to work near any processing machines.  (Doc. # 22-17 p. 18).  The box section at the Plant was vented to the outside lobby, and was located 88 to 100 feet from the nearest mail processing machine. (Doc. # 22-17 p. 18; Doc. #

11

22-20; Doc. # 22-21).  Furthermore, the culling equipment was updated with a closed type vacuum system to protect from bio-hazards and minimize micro airborne dust particles. (Doc. # 22- 17 p. 19; Doc. # 22-21).

The Birmingham Plant adheres to strict OSHA guidelines and has never been cited or fined for OSHA violations relating to dust levels in the Plant. Air filters, located throughout the plant, trap dust and keep it from settling. The filters are regularly maintained.  (Doc. # 22-17 p.19).  On June 6, 2007, Unified Testing & Engineering Services, Inc. (UTS) provided the results of an Industrial Hygiene Sample of the Birmingham Main Post Office. A total of twelve air samples were collected. The samples were analyzed for total and respirable particulates. The results of the analysis showed that, in general, low concentrations of particulates were available for respiration. Total and respirable concentrations were found to be mostly below method detection limits. UTS was unable to detect any obvious particulate problems and did not recommend additional particulate sampling. (Doc. # 22-18).

Until August 15, 2008, Plaintiff only had the work related restrictions previously documented in her permanent rehabilitation assignment on file with the HRM office. (Doc. # 22-17 p. 8).  After Plaintiff was notified she was being excessed to the Birmingham Plant, she filed a new occupational disease claim for "reactive airway disease or severe asthma." (Doc. # 22-17 p. 18).  Prior to submitting this claim, the only open claim regarding Plaintiff's medical condition was regarding her knee, although the USPS had older documentation regarding her asthma.  (Doc. # 28-66 pp. 20-21).

When excessed employees are given a new job offer, they have the opportunity, if they believe that the offer is not within their restrictions, to reject that offer.  (Doc. # 28-16 p. 20). Plaintiff accepted the job at the Birmingham Plant.  However, Plaintiff noted that her acceptance was

"under protest" because she felt that she was being placed in an environment that was detrimental to her health. (Doc. # 22-15; Doc. # 28-2 pp. 48-49).  Suzanne Hutchinson, HRM specialist in the injury compensation department, called Lewis about her acceptance of the job "under protest." (Doc. # 28-2 p. 49).  When told by Hutchinson that she had to either accept the job or not accept it, Lewis told Hutchinson that she had gone to the plant and it exacerbated her asthma to the extent that she had been to the emergency room and was advised by her physician to take two days off work. (Doc. # 22-17 p. 85; Doc. # 22-1 p. 48; Doc. # 28-2 pp. 49-50).

Lewis also informed Kathy Martin that her asthma had been exacerbated at the Birmingham Plant and that she had gone to the emergency room. (Doc. # 28-2 p. 50).  Martin told Plaintiff that she would call Nurse Todd, who had previously handled her asthma claim in around 2004 and who was handling the claim regarding her knee, to come down to the Birmingham Plant to verify the job and work site, and instructed Plaintiff not to come back to work until she called Lewis back to tell her something.  (Doc. # 22-1 p. 50). Plaintiff also telephoned Nurse Todd to advise her of what had happened.  (Doc. # 22-17 p. 10).

Martin indeed asked Nurse Todd to visit the work site.  (Doc. # 22-6 p.54; Doc. # 22-17 p. 10).  Plaintiff's report date to her new job was delayed to give Nurse Todd an opportunity to visit the work site. (Doc. # 22- 1, p. 50).  Nurse Todd and Sandra Pearce, a HRM Specialist, visited the work site. (Doc. # 22-6 p. 54). However, Nurse Todd was clear that she did not evaluate the site related to Plaintiff's breathing issues; the only medical restriction information she had before her at that time was with regard to Plaintiff's knee.  (Doc. # 28-66 p. 24).

Having heard nothing further as a result of Nurse Todd's visit, Plaintiff reported to work a week later, experienced the same breathing problems, and again went to an emergency room. (Doc.

13

# 22- 1, p. 56).  On or about August 22, 2008, Plaintiff again tried to return to work but had difficulty breathing. (Doc. # 22- 17, p.10).  She tried to work, but because of difficulty breathing spent almost her whole shift sitting outside of the plant. (Doc. 28-2 p. 54).  Plaintiff's doctor wrote a letter asking that they change her workplace or work because of the effect it was having on her breathing.  (Doc. # 28-2 p. 54; Doc. # 28-19).

In December 2008, Plaintiff was informed she was being excessed from the clerk position to the mail handler position and was offered a modified mail handler position. (Doc. # 28-22). Rather than rejecting this position, Plaintiff again accepted it under protest.  (Doc. # 28-22).  In this letter, Plaintiff was also informed of her right to retreat back to her clerk position should vacancies occur.  (Doc. # 28-22).  Plaintiff indicated her desire to retreat to the clerk craft.  (Doc. # 28-22).

The effective date of Plaintiff's move to the mail handler position did not occur until March 28, 2009.  (Doc. # 28-23; Doc. # 28-24).  Plaintiff went to work in March 2009 as a mail handler at the Birmingham Annex where she worked until May 2009.   (Doc. # 28-2 pp. 54-55, 104). Thereafter, Plaintiff's doctors advised her to remain off of work because she was unable to work in an environment which was not dust free.  (Doc. # 28-25; Doc. # 28-26).

In September 2009, Plaintiff was offered a position in the clerk craft in the Birmingham Plant in accordance with her retreat request.  (Doc. # 28-29).  She did not accept it.  (Doc. # 28-29; Doc. # 28-2 p. 104).  The offered job was eventually determined not to be suitable for Plaintiff's medical restrictions.  (Doc. # 28-2 pp. 104-5).

## G.    Plaintiff's Request for a Reasonable Accommodation

Reasonable accommodation requests are to be submitted to the District Reasonable Accommodation Committee.  The Manager of Labor Relations is the Chairman. (Doc. # 22-6 p. 58).

14

Martin and Hutchinson have indicated that they were not aware of any formal request for reasonable accommodation from Plaintiff. (Doc. # 22-17 bates no. 151, 172). Plaintiff's name was not on a listing from the Labor Relations Office of all of the employees who had requested reasonable accommodations during the time in question. (Doc. # 22-17 p. 19). However, Martin had spoken with Plaintiff regarding Plaintiff's concerns that the position aggravated her asthma and helped arrange to have Nurse Todd evaluate the position. (Doc. # 22-1 p.50).

Furthermore, on or about October 20, 2008, Plaintiff filed a grievance regarding her assignment to the Birmingham Plant. (Doc. # 28-1). Plaintiff alleged that she was placed in a position that was not within her restriction not to work around dust and which aggravated her asthma, and she requested that she be placed in a job within her restrictions. (Doc. # 28-11).

On December 4, 2008, Plaintiff filed a formal complaint of discrimination regarding the August 11, 2008 job assignment. (Doc. # 22- 17). The specific issue accepted for investigation was Plaintiff's allegation that she was discriminated against based on physical disability (respiratory condition) and retaliation, when on August 11, 2008, she was denied a reasonable accommodation of suitable work within her medical restrictions. (Doc. # 22-17, p.1). Plaintiff named Martin and Hutchinson as the responsible management officials. (Doc. # 22- 17, p. 80).

H.    **Allegation of Retaliation**

Plaintiff asserts that she was retaliated against when she was "uprooted" from Meadowbrook and placed into jobs that were not suitable for her medical restrictions at the Birmingham Plant. (Doc. # 22-1, pp. 77, 80; Doc. # 22-17).

Martin testified that she had no knowledge of Plaintiff's prior EEO activity, case no. 4H-350-0032-07, filed on May 1, 2007. (Doc. # 22-17, pp. 143 &172). Indeed, there is no evidence

15

that Hutchinson had any knowledge of Plaintiff's prior activity either.  In any event, HRM employees do not make the determination of where employees are assigned to work.  (Doc. # 22- 17, p. 175; (Doc. # 22- 17, p. 74).  Furthermore, Taylor was not involved in the determination of which employees would be excessed.  (Doc. # 22- 2, p. 62).

## II.     Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* 249.

16

III.     **Discussion**

    A.     **Counts I and II - Race and Disability Discrimination Regarding Days Off**

        1.     **There Is No Direct Evidence In This Case.**

A plaintiff in an employment discrimination case maintains the ultimate burden of proving that the adverse employment decision was discriminatory. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509-12 (1993); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184 (11th Cir. 1984). Although the Supreme Court previously established the basic allocation of burdens and order of proof in a disparate treatment case, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981), as modified by *Desert Palace v. Costa*, 539 U.S. 90 (2003), that allocation scheme applies only in cases where there is no direct evidence of discrimination, *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 595 (11th Cir. 1987).

The Eleventh Circuit "has marked severe limits for the kind of language to be treated as direct evidence of discrimination." *Jones v. Bessemer Carraway Medical Ctr.*, 151 F.3d 1321, 1323 n.11 (11th Cir. 1998,). "'Direct evidence' ... is 'evidence, which if believed, proves existence of fact in issue *without inference or presumption*....  Evidence that only suggests discrimination,  ... or that is subject to more than one interpretation, ... does not constitute direct evidence.'" *Roberts v. Design & Mfg. Services, Inc.*, 167 Fed.Appx. 82, 84-85 (11th Cir. 2006) (quoting *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997))(emphasis added). "[O]nly the most blatant remarks, whose intent could be nothing other than to discriminate ... constitute direct evidence of discrimination." *Carter v. Miami*, 870 F.2d 578, 582 (11th Cir.1989); *see also Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th Cir. 1999).

17

Plaintiff alleges that there is direct evidence that Defendant changed Plaintiff's off days because of her disability.[4]   That argument has no merit.  There is no evidence that Defendant changed Plaintiff's off days because of a "disability."  Defendant's witnesses testified that Plaintiff's off days were changed due to staffing needs.  Admittedly, this came at a time when Plaintiff's *medical restrictions* were considered permanent and she was moved to a different craft which she could perform.  Before that time, Plaintiff was entitled to retain her off days for a period of two years under Defendant's policies.  After two years, Plaintiff's medical restrictions became permanent and she could be moved into a permanent position different than the one she held before.  Defendant was obligated to minimize the impact on Plaintiff, but nothing prohibited it from considering its business or staffing needs in making a permanent job offer.

Therefore, the discrimination claims in this case must be evaluated under the *McDonnell Douglas/Burdine* scheme.  That analysis requires a plaintiff to initially shoulder the burden of establishing a *prima facie* case of discrimination.  Once the plaintiff does that, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision.  Finally, if the defendant carries that exceedingly light burden, the plaintiff must *either* present substantial evidence that the legitimate reasons offered by the defendant are merely a pretext for discrimination *or* present sufficient evidence, of any type, for a reasonable jury to conclude that discrimination was a "motivating factor" for the employment action, even though defendant's legitimate reason may also be true or have played some role in the decision.  *McDonnell Douglas Corp.*, 411 U.S. at 802-05; *Burdine*, 450 U.S. at 252-54;  *Desert Palace*, 539 U.S. at 101-02.

---

[4] Plaintiff does not assert that there is direct evidence of race discrimination.

### 2.   Plaintiff Has Failed to Establish a Prima Facie Case of Discrimination Regarding Her Days Off

"In order to establish a prima face case, a plaintiff must present 'evidence adequate to create an inference that an employment decision was based on an [illegal] discriminatory criterion. . . .'" *Dent v. Federal Mogul Corp.*, 129 F.Supp. 2d 1311, 1314 (N.D. Ala. 2001) (quoting *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312 (1996) (quoting *Teamsters v. United States*, 431 U.S. 324, 358 (1977))). Although the requirements to establish the prima facie case are flexible,[5] the Eleventh Circuit has frequently articulated the requirements along these lines: "In order to establish a prima facie case of disparate treatment based on [race or disability] discrimination, a plaintiff must show four things: (1) that she is a member of a protected class; (2) that she was qualified for her job; (3) that she suffered an adverse employment action; and (4) that her employer treated similarly situated employees who are not members of the protected class more favorably." *E.g., Wood v. K-Mart Corp.*, 273 Fed.Appx. 806, 807 (11th Cir. 2008) (citing *Rice-Lamar v. City of Ft. Lauderdale*, 232 F.3d 836, 842-43 (11th Cir. 2000)). Plaintiff's claim for disability discrimination under the Rehabilitation Act involves the same burden-shifting methodology. *See Seaman v. CSPH, Inc.*, 179 F.3d 297, 300 (5th Cir. 1999).[6]

Considering Plaintiff's race and disability claims regarding her off days together, it is

___

[5] More than one formulation of the elements of a prima facie case exists. The Supreme Court in *McDonnell Douglas* recognized this when it stated that "[t]he facts necessarily will vary in Title VII cases, and the specification . . . of the prima facie proof required . . . is not necessarily applicable in every respect to differing factual situations." 411 U.S. at 802 n.13.

[6] "[D]iscrimination claims brought under the Rehabilitation Act are governed by the same standards as claims brought under Title I of the Americans with Disabilities Act of 1990 ("ADA")." *McKay v. Johanns*, 265 Fed.Appx. 267, 268 (5th Cir. 2008) (citing 29 U.S.C. § 794(d)).

undisputed that Plaintiff is a member of two protected classes.  She is African American, and Defendant does not dispute that she has a disability.  (*See, e.g.,* Doc. # 21 at 38-39).  Further, she was qualified for the job she held.  Thus, Plaintiff can satisfy the first two elements of her *prima facie* case.  However, Plaintiff has not established either that she suffered an actionable adverse employment action in having her days off changed, nor that she was treated less favorably than similarly situated employees outside of her protected classes.

### A.  The Change In Off Days Was Not an Adverse Employment Action

The Rule 56 record makes clear that the change in days off is not sufficiently adverse to constitute an *actionable* adverse employment action.  Plaintiff went from having every Sunday and every other Saturday off as a rural carrier, to having each Saturday and Sunday off for a period of two years, to having every Sunday and every Wednesday off.  Plaintiff in fact went from originally having two days off one week and only one day off the other week, to having two days off every week, to still having two days off each week, albeit not consecutive days.  There is no allegation that Plaintiff's pay was negatively affected by these changes.

An adverse employment action must be a serious and material change in the terms, conditions, or privileges of employment in a "real and demonstrable way." *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001). As such, Plaintiff must either provide evidence of an "ultimate employment decision," (*i.e.,* termination, failure to hire, or demotion), or, for conduct falling short of an ultimate employment decision, show that the employer's conduct, in some substantial way, altered her "compensation, terms, conditions, or privileges of employment," deprived her of employment opportunities, or adversely affected her status as an employee.

20

*Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir.2008) (quotations omitted).  An "employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Davis*, 245 F.3d at 1239-40. Thus, not all conduct by an employer that negatively affects an employee constitutes an adverse employment action. *See Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir. 1998).

At least three courts (in two cases) have held that a change in a postal employee's scheduled days off is not an actionable adverse employment decision.  *See  Grosskopf v. Potter*, 2008 WL 2884544, 1 (5th Cir. 2008) *aff'g Grosskopf v. Potter*, 2007 WL 2428151, 3 (W.D. Tex. 2007); *Smith v. Potter*, 629 F.Supp.2d 644, 651-52 (S.D. Miss. 2009).

While Plaintiff has indicated that she desired to continue having each Saturday and Sunday off,  this was simply a matter of personal preference. There has been no allegation or suggestion that the schedule created any hardship for Plaintiff or took advantage of any "unique vulnerability" of Plaintiff.   The position she originally bid on as a rural carrier only had two days off every other week.  Under the circumstances, this change about which she complains does not constitute an actionable adverse employment action. *See Thomas v. Potter*, 202 Fed.Appx. 118, 119 (7th Cir. 2006) (finding plaintiff's assertion that shift change was undesirable or inconvenient did not rise to the level of a materially adverse employment action under *Burlington*[7] where the plaintiff did not assert and the record did not contain evidence that the plaintiff had "a unique vulnerability that the Postal Service knew about and sought to exploit by changing his shift schedule").

------------------------------------------------------------

[7] The United States Supreme Court's decision in *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006), dealt exclusively with adverse employment actions in the *retaliation* context.

21

Therefore, Plaintiff has failed to establish the third element of her *prima facie* case on her race and disability claims regarding her off days.

### 2.    Plaintiff Failed to Establish That She Was Treated less Favorably than a Similarly Situated Employee Outside Her Protected Class

Plaintiff does not even attempt to argue that a non-disabled employee was treated more favorably by the USPS in regard to the scheduling of off days.  Instead, she sets forth a number of arbitration decisions addressing various different factual circumstances in an attempt to show that Plaintiff should have been given Saturdays and Sundays off.  However, the facts before this court show that, at the time Plaintiff was converted from the mail carrier craft to the clerk craft and given a permanent modified position, Meadowbrook already had one window clerk, one box clerk and one limited duty clerk – and each of them already had Saturdays off. The station also had a distribution clerk and a window clerk who were off on Friday, and two clerks were off on Thursday. (Doc. # 22-7 p. 69; Doc. # 22-2  p. 47).  The only day that Meadowbrook had only one clerk off was Wednesday. Therefore, based upon the station's staffing needs, Plaintiff's permanent clerk position offer had Sunday and Wednesday off. (Doc. # 22-2 pp. 42, 43, 77; Doc. # 22-11 p. 54).  This factual situation simply does not give rise to an inference of disability discrimination and Plaintiff has not attempted to identify a non-disabled comparator. "A plaintiff fails to establish a prima facie disparate treatment case if [s]he fails to show that [s]he was treated less favorably than a similarly-situated person outside [her] protected class." *Alansari v. Tropic Star Seafood Inc.,* 388 Fed.Appx. 902, 904 (11th Cir. 2010) (citing *McCann v. Tillman*, 526 F.3d 1370, 1373 (11th Cir. 2008)).  Therefore, Plaintiff has failed to establish a prima facie case of disability discrimination on her claim related to her days off.

As to Plaintiff's claim that she was discriminated against on the basis of her race with regard to her off days, although she has identified two alleged comparators, she has failed to show that they are legally appropriate comparators. "A 'comparator' is an employee outside of the plaintiff's protected class who is similarly situated to the plaintiff 'in all relevant respects.'" *Coar v. Pemco Aeroplex, Inc.*, 372 Fed.Appx. 1, 2 (11th Cir. 2010) (quoting *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004)). The comparator must be nearly identical to the plaintiff to prevent "courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Burke-Fowler v. Orange County*, 447 F.3d 1319, 1323 (11th Cir. 2006) (quotation omitted).

Plaintiff identified as a comparator Alicia Kenerley, a white female, who was allegedly treated more favorably. Kenerley was hired in the clerk craft in 1984. (Doc. # 22-11 p. 35). At the time of her injury, her off days in her bid position were already Saturday and Sunday. (Doc. # 22-11 p. 42). In May 2002, Kenerley volunteered to go to Meadowbrook on a temporary basis, but only if her tour of duty did not change. (Doc. # 22-11 p. 42). After two years of limited duty, in 2003, Kenerley was offered a permanent modified Mail Processing Clerk position (still within the clerk craft where she had a seniority date of 1984) at Meadowbrook with Saturday and Sunday off. (Doc. # 28-4). Kenerley was offered the position in 2003 because Meadowbrook needed a clerk to sit all day and do return to sender and address changes. Anyone chosen for that position at that time would have been given Saturday and Sunday off because those off days came with the position. (Doc. # 22-7 p. 70). Kenerley is simply not an appropriate comparator, not only because her limitations and position were different, but also because she had vastly more seniority than Plaintiff not only within the clerk craft, but also in total with the USPS.

Plaintiff also identified Judy Delaney, a white rural carrier who was injured on April 24,

23

2007, after Plaintiff had already been converted from the rural carrier craft to the clerk craft. (Doc. # 22-2 p. 55-57; Doc. # 22-26). Delaney returned to work at Meadowbrook in a limited duty capacity in or about October 2008. (Doc. # 22-28). Thus, in 2010, Delaney was still within her two-year limited duty period. During her own limited duty period, Plaintiff was allowed to maintain Saturday and Sunday off days, as was Delaney. During this limited duty period, Delaney performed "make work," as did Plaintiff, but she did not occupy a permanent position. Delaney performed a limited duty rural carrier position similar to that which Plaintiff performed, but she also delivered Express Mail and assisted customers in the lobby, a task which, during the holiday season, could have comprised three to four hours of her day. (Doc. # 22-2 p. 54, 57; Doc. # 22-28). Moreover, Delaney also had significantly more seniority with the USPS than Plaintiff, having been hired in 1983. (Doc. # 51-30).

As the facts of their respective circumstances show, neither Kenerley nor Delaney was similarly situated to Plaintiff "in all relevant respects." Therefore, they are not appropriate comparators. Because Plaintiff has failed to show that she was treated less favorably than a similarly situated person outside her protected class, she has failed to establish the fourth element of her prima facie case on her disparate treatment claims regarding her off days. *Alansari,* 388 Fed.Appx. at 904; *McCann*, 526 F.3d at 1373.

Plaintiff has failed to establish two of the four elements of her prima facie case, and Defendant is entitled to summary judgment on Plaintiffs disparate treatment claims regarding her days off.

24

### 3.      Defendant's Legitimate, Non-Discriminatory Reasons

Even if Plaintiff could establish a prima facie case of discrimination with respect to her days off, Defendant has articulated legitimate, non-discriminatory reasons for that decision.  When Plaintiff was converted from the mail carrier craft to the clerk craft, Meadowbrook already had one window clerk, one box clerk and one limited duty clerk, and each of those employees already had Saturday off.  Meadowbrook also had a distribution clerk and a window clerk off on Friday, and two clerks off on Thursday. (Doc. # 22-7 p. 69; Doc. # 22-2  p. 47).  The only day that Meadowbrook had only one clerk off was Wednesday.  Therefore, Plaintiff's permanent clerk position offer had Sunday and Wednesday as off days. (Doc. # 22-2 pp. 42, 43, 77; Doc. # 22-11 p. 54).

### 4.      Plaintiff Has Not Established That Defendant's Reason For Its Decision Are A Pretext for Race or Disability Discrimination.

If an employer "articulates one or more [legitimate, non-discriminatory] reasons, the presumption of discrimination is eliminated and 'the plaintiff has the opportunity to come forward with evidence  . . . sufficient to permit a reasonable fact finder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.'"  *Chapman v. AI Transport*, 229 F.3d 1012, 1024-25 (11th Cir. 2000) (citing *Combs v. Plantation Patterns*, 106 F.3d 1519, 1527-28 (11th Cir. 1997) (citations omitted)).  Here, Defendant has articulated legitimate, non-discriminatory reasons and, therefore, the court turns to the "focused" inquiry concerning whether Plaintiff can show pretext.  *Silvera v. Orange County School Board*, 244 F.3d 1253, 1258 (11th Cir. 2001).  "If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim."  *Chapman*, 229 F.3d at 1024-25 (citing

*Combs*, 106 F.3d at 1529).

"A plaintiff may not recast an employer's proffered non-discriminatory reasons or substitute his business judgment for that of the employer.  Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet the reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Hammock v. Nexcel Synthetics, Inc.*, 201 F. Supp. 2d 1180, 1187 (N.D. Ala. 2002) (quoting *Chapman*, 229 F.3d at 1029 (citing *Alexander v. Fulton County*, 207 F.3d 1303, 1341 (11th Cir. 2000) and *Combs*, 106 F.3d at 1541-43))).

A plaintiff may establish pretext in at least two ways: by showing that (1) "a discriminatory reason more likely motivated" a decision or (2) "the employer's proffered reason is unworthy of credence."  *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981). In her attempt to establish pretext, Plaintiff has not argued that the reasons articulated by Defendant are not true. Nor has she presented any evidence that race or disability was the real reason for the decision. Instead, in essence, Plaintiff argues that Defendant's policies which instruct it to try to minimize the disruptive impact of its decisions on employees in fact require it to ignore operational staffing needs in making permanent staffing decisions.

"In order to avoid summary judgment, a plaintiff must produce enough evidence for a reasonable factfinder to conclude that each of the employer's proffered nondiscriminatory reasons is pretextual." *Chapman*, 229 F.3d at 1037 (citing *Combs*, 106 F.3d at 1543).  Plaintiff cannot meet her burden by merely showing that Defendant's proffered reasons for giving her split off days were ill-founded; rather, she must present substantial evidence that unlawful discrimination was the true reason for the decision. *See Reeves*, 530 U.S. at 148 (showing only that proffered reasons are false

does not necessarily get plaintiff past summary judgment).  This Plaintiff has failed to do.

The anti-discrimination laws do not require an employer's decisions to be objectively reasonable or even fair; they simply prohibit the employer from discriminating on the basis of membership in a protected class.  Courts do not sit as a "super-personnel department," and it is not their role to second-guess the wisdom of an employer's business decisions – indeed the wisdom of them is largely irrelevant so long as those decisions were not made with a discriminatory motive. *Chapman*, 229 F.3d at 1030; *see also Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984) ("[An] employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.").  Thus, in this case, even if the decision to give more weight to staffing needs than contractual provisions was unwise, that does not give rise to an inference that the decision was actually based on race or disability.

Because Plaintiff has failed to establish that Defendant's reasons for assigning her off days was a pretext for race and/or disability discrimination, Defendant is entitled to summary judgment on Counts I and II of Plaintiff's Amended Complaint.

**B.     Counts III and IV - Retaliation for Complaints of Race Discrimination and Seeking Reasonable Accommodation**

**1.     Plaintiff Has Failed to Establish a Prima Facie Case of Retaliation**

Plaintiff contends that her assignment to the Birmingham Plant in August 2008 was in retaliation for her earlier complaints of discrimination.  (Doc. # 40 p. 51).  To establish a prima facie case of retaliation, a plaintiff must present evidence showing that (1) she engaged in statutorily protected expression, (2) her employer took action that would have been materially adverse to a

reasonable employee, and (3) some causal relation existed between the two events. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68-69 (2006) (announcing "materially adverse" element); *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001).

It is undisputed that Plaintiff engaged in statutorily protected conduct. On May 1, 2007, she filed EEO Complaint No. 4H-350-0032-07 in which she alleged that her off days were changed because of her race and/or disability. On or about October 20, 2008, Plaintiff filed a grievance regarding her assignment to the Birmingham Plant in which she alleged that she was placed in a position that did not accommodate her disability and requested a position which did so. (Doc. # 28-11). Finally, on December 4, 2008, Plaintiff filed a second EEO Complaint, No. 4H-350-0149-08, in which she alleged that she was discriminated against on the basis of her disability and retaliated against. Therefore, Plaintiff has established the first element of her retaliation claim.

Plaintiff has also established an adverse employment action. Plaintiff asserts that she was retaliated against when she was "uprooted" from Meadowbrook and placed into jobs that were not suitable for her medical restrictions at the Birmingham Plant. (Doc. # 22-1, pp. 77, 80; Doc. # 22-17). Plaintiff's asthma was exacerbated while she was in these positions, and thereafter, she claims that Defendant failed to find her a position in which her disability, *i.e.,* her asthma, could be accommodated. This evidence is at least sufficient to create an issue of material fact as to the second element of Plaintiff's retaliation claim, an adverse employment action.

What Plaintiff has failed to establish here, however, is causation. To establish causation, a plaintiff must generally show, at a minimum, that the decision maker was aware of the protected conduct at the time of the adverse employment action. *See Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993); *Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1197 (11th Cir.

1997) ("[I]n a case involving a corporate defendant the plaintiff must show that the corporate agent who took the adverse action was aware of the plaintiff's protected expression... ."). That requirement rests upon both legal and common sense principles. A decision maker cannot have been motivated to retaliate by something unknown to him.

Here, although the record is unclear about exactly who made the decision to excess Plaintiff from Meadowbrook, what is clear is that Taylor was not involved in the determination of which employees would be excessed. (Doc. # 22- 2, p. 62). And it is irrelevant for purposes of this case whether Martin or Hutchinson made the decision. Martin had no knowledge of Plaintiff's May 1, 2007 EEO Complaint. (Doc. # 22-17, pp. 143, 172). Further, there is no evidence that Hutchinson had any knowledge of Plaintiff's prior EEO Complaint either. (Doc. # 22- 17, p. 175).

However, even assuming that the decisionmaker was aware of Plaintiff's protected conduct, the protected activity occurred *over a year prior* to the alleged retaliatory decision, *i.e.,* the decision to "uproot" Plaintiff from Meadowbrook. The Eleventh Circuit has held that four and one-half months is not temporally close, much less "very close" for purposes of inferring causation. *Garrett v. University of Alabama at Birmingham Board of Trustees*, 507 F.3d 1306, 1316-17 (11th Cir. 2007). The time lapse of over one year between the protected conduct and the alleged adverse actions is too great to constitute circumstantial evidence of causation. *See, e.g., Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) (citing affirmatively several court of appeals decisions for the proposition that a three to four month gap is insufficient to establish the causal relation prong in a retaliation case); *Wascura v. City of South Miami*, 257 F.3d 1238, 1244-45 (11th Cir. 2001) (holding three and one-half month period between plaintiff's protected conduct and the adverse employment action was insufficient to establish a causal connection); *Keel v. U.S. Dept. of Air Force*, 256

29

F.Supp.2d 1269, 1291 (M.D. Ala.2003) ("Where, as here, more than seven months elapsed between the last of Plaintiff's protected conduct and the allegedly retaliatory action, the timing of the events does not constitute circumstantial evidence of causation."). Because there is no other evidence other than the fact that the alleged retaliation occurred after the protected conduct even linking those decisions, Plaintiff's claim of retaliation fails as a matter of law on the causation element.

Plaintiff argues that she engaged in other protected conduct after her 2007 EEO Complaint. However, each of these instances of protected conduct occurred *after* the decision was made to excess Plaintiff from Meadowbrook. The position Plaintiff was offered at the Birmingham Plant was effective August 16, 2008. Her grievance was not filed until October 20, 2008, and its subject was the previously made decision to assign her to the Birmingham Plant. Therefore, this protected conduct could not have formed the basis for the alleged retaliatory conduct. The same is true of her December 2008 EEO Complaint. Thus, these other instances of protected conduct could not have caused the earlier alleged retaliatory conduct – that decision had already been made. Thus, Plaintiff has failed to establish the causation element of her prima facie case.

### 2. Defendant's Legitimate, Non-Discriminatory Reasons

Even if Plaintiff had established a prima facie case of retaliation with regard to being excessed from Meadowbrook to the Birmingham Plant, Defendant has satisfied its burden of articulating legitimate, non-retaliatory reasons for that decision. Starting in around 2007, mail volume dropped, as did USPS revenues. These events meant that the USPS needed fewer employees. Therefore, the decision was made to excess certain employees based upon operational needs. Who was excessed within certain crafts was based solely upon seniority. (Doc. # 22- 2 p. 60; Doc. # 22-22;  Doc. # 22-15).

### 3.    Plaintiff Has Not Established That Defendant's Reasons For Its Decision Are A Pretext for Retaliation

Plaintiff has not even attempted to argue that these reasons are pretextual. Instead, Plaintiff argues that she should have been allowed to stay at Meadowbrook. Nothing she has presented even tends to show that the reasons articulated by the USPS were not the real reasons for the decision and that retaliation was the motivating factor. Furthermore, the stated reasons are ones that regularly motivate reasonable employers and, even more importantly, the Rule 56 evidence is undisputed that these were the reasons Defendant acted here. Therefore, even if Plaintiff had established a prima facie case of retaliation, she has failed to establish pretext.

Because Plaintiff has failed to establish that Defendant's reasons for excessing Plaintiff from the Meadowbrook Station were a pretext for retaliation, Defendant is entitled to summary judgment on the retaliation claims asserted in Counts III and IV of her Amended Complaint.

### C.    Count I - Failure to Accommodate under the Rehabilitation Act

Under the Rehabilitation Act (just as under the ADA), it is unlawful discrimination for an employer to fail to provide a reasonable accommodation for a qualified disabled individual. *See D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1225-26 (11th Cir. 2005). To establish a failure to accommodate claim, a plaintiff must show that (1) she was disabled, (2) she was otherwise qualified, and (3) a reasonable accommodation was not provided. *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001). Reasonable accommodations may include job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, and other similar accommodations. The law "may require an employer to restructure a particular job by altering or eliminating some of its marginal functions." *Lucas v. W.W.*

*Grainger, Inc.*, 257 F.3d 1249, 1260 (11th Cir. 2001).

Defendant does not dispute that Plaintiff's asthma is a disability. What it does dispute is whether there was an accommodation which could have been provided to Plaintiff to enable her to perform the essential functions of her job. Defendant argues that Plaintiff's request for a "dust free" and "fume free" environment at the Birmingham Plant would work an undue hardship. In support of this argument, Defendant points out that it previously made "numerous attempts" to provide Plaintiff with a work environment within her restrictions. The fact is, Defendant did provide Plaintiff with a position which accommodated her asthma up until the time she was moved to the Birmingham Plant. When Plaintiff visited the Birmingham Plant prior to beginning her assignment there, it triggered her asthma. Plaintiff spoke with Martin about whether the Birmingham Plant was an appropriate assignment. Martin sent Nurse Todd to evaluate the job for Plaintiff. However, significantly, Nurse Todd performed the evaluation of the job for Plaintiff and deemed it acceptable without any information about, and without reference to, the disability at issue here: Plaintiff's asthma. Nurse Todd was clear that she did not evaluate the site related to Plaintiff's breathing issues; the only medical restriction information she had before her at that time was with regard to Plaintiff's knee. (Doc. # 28-66 p. 24). Thus, although Defendant told Plaintiff it would evaluate the position in reference to her asthma, it thereafter failed to have that evaluation performed before she reported to work.

Defendant's argument regarding whether Plaintiff could have been reasonably accommodated is thereafter limited to the positions within the Birmingham Plant. Defendant asserts that continuing to accommodate Plaintiff in the previously acceptable position she held in Meadowbrook is unreasonable as a matter of law because it would have required it to violate its collective bargaining

32

agreements.  However, Plaintiff has presented substantial evidence which identifies a number of other positions she claims she could have performed.

The record before the court includes evidence that Defendant sent a nurse to evaluate a position for Plaintiff with no specific information regarding her disability at issue here (asthma). Therefore, the court concludes that there remain genuine issues of material fact regarding whether Defendant engaged in the appropriate dialogue regarding a reasonable accommodation and whether it could have reasonably accommodated Plaintiff's asthma following the decision to excess clerks from the Meadowbrook station.  Therefore, summary judgment on Plaintiff's failure to accommodate claim under Count I of Plaintiff's Amended Complaint is due to be denied.

## IV.    Conclusion

For the reasons stated above, Defendants' motion for summary judgment (Doc. # 38) is due to be granted in part and denied in part.  The court will enter a separate order granting the motion.

**DONE** and **ORDERED** this ____23rd____ day of March, 2011.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE